JOHN W. HUBER, United States Attorney (#7226)
ALLISON J.P. MOON, Assistant United States Attorney (#15204)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br> vs. <br><br> ROBERT LEE HOLLOWAY, <br><br> Defendant. | Case No. 2:11-CR-00984-001 RJS <br> & 2:11-CR-00985-RJS <br><br> **MOTION FOR RECONSIDERATION OF DEFENDANT ANDRES' MOTION FOR APPLICATION OF FORECLOSURE PROCEEDS TO RESTITUTION BALANCE** |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br> vs. <br><br> ROBERT J. ANDRES, <br><br> Defendant. | Honorable Robert J. Shelby |

The United States of America ("the United States") moves this Court to reconsider its decision granting Defendant Robert Andres' Motion for Timely Mailings and Proper Restitution Credit.[1]  As shown below, none of the $16,734.89 that the Receiver recovered from the foreclosure of Mr. Andres' house ever reached the victims, and, therefore, neither he nor Mr. Holloway may receive any credit for this recovery under the victim's rights statutes.  Granting Mr. Andres'

---

[1] Dkt. 122.

motion, and thereby adding $16,734.89 to the total restitution credits, confers a windfall upon Mr. Andres and works a manifest injustice to the victims.

## BACKGROUND

Defendant Andres pleaded guilty to Wire Fraud on August 21, 2013, and, on December 17, 2014, he was sentenced to 56 months in prison, three years of supervised release, $3,291,310.39 in restitution, and a $100 special assessment fee. The restitution payees were left, "To be determined."[2] Defendant Holloway, Defendant Andres' partner in the Ponzi scheme, was found guilty of Wire Fraud and Making and Subscribing a False Income Tax Return, and on December 17, 2014, he was sentenced to 225 months in prison, three years of supervised release, $15,200,000.00 in restitution, and a $100 special assessment fee. The restitution payees were left, "To be determined."[3] On February 10, 2015, a Final Restitution Order was entered under seal requiring restitution payments to be submitted to Receiver Wayne Klein for distribution to the victims according to the scheme set forth in the Order.[4] Mr. Andres' and Mr. Holloway's restitution orders are not joint and several.[5]

Prior to the above criminal prosecutions, the U.S. Commodity Futures Trading Commission brought a civil action against Defendant Andres and Defendant Holloway and their entities, U.S. Ventures, LLC and Winsome Investment Trust, asserting claims for violations of the Commodity Exchange Act, which arose from the same wrongful actions as the above criminal cases.[6] On January 25, 2011, the court appointed Mr. Klein as the Receiver of U.S. Ventures LC,

---

[2] Dkt. 73 and 102.
[3] 2:11-CR-00984, Dkt. 248.
[4] Sealed Final Restitution Order of 2/10/15
[5] Dkt. 102; 2:11-CR-00984, Dkt. 248.
[6] 2:11-CV-00099-BSJ, Dkt. 1

2

Winsome Investment Trust, and the assets of Robert J. Andres and Robert L. Holloway.[7] To date, Mr. Klein has recovered $4,739,183.31. However, Mr. Klein has distributed $2,237,920.11 in recovered funds to the victims (not including Holloway's $700 restitution payment).[8] According to Mr. Klein, nearly[9] all of the funds that he disbursed to victims were recovered from third parties.[10] However, the disbursed funds did not include the $16,734.89 in foreclosure sale proceeds that he recovered from CitiMortgage because the fees and costs that Mr. Klein incurred in his effort to recover those funds far exceeded the actual recovery, resulting in a net negative to the receivership, which meant that none of that money was distributed to victims.[11]

In his Declaration Mr. Klein describes in detail his efforts to recover the foreclosure proceeds from Robert and Ursula Andres' home at 10802 Archmont Drive, Houston, TX 77070 ("the Andres Home"), and the fees and costs he incurred in that effort. Robert Andres' interest the Andres Home became the property of the receivership upon Mr. Klein's appointment; however, Robert's wife Ursula Andres asserted that she owned a 50% interest in the property.[12] Ursula Andres was the recipient of $311,075.00 that Winsome Investment Trust (an entity controlled by

---

[7] Declaration of Wayne Klein, p. 2, par. 2.
[8] Mr. Klein measured his total recovery by adding all deposits into the receivership's three accounts and eliminating all expenditures and transfers between accounts. Mr. Klein is holding some funds to cover receivership expenses and anticipates making a final distribution of approximately $225,000 to the victims. Declaration of Wayne Klein, p. 7-8, par. 17.
[9] As will be explained below, the undersigned learned on January 25, 2017, that the funds disbursed to the victims included $896.19 recovered from the receivership defendants' bank accounts. Before January 25, 2017, the undersigned did not know these funds were included in the distributions.
[10] Declaration of Wayne Klein, p. 6, par. 13.
[11] *See* Declaration of Wayne Klein.
[12] Declaration of Wayne Klein, p. 2-3, par. 5.

3

Robert Andres)[13] fraudulently transferred to her, and on September 10, 2013, Mr. Klein obtained a judgment against Ms. Andres for that amount.[14]  In granting summary judgment to Mr. Klein, the court found that "the undisputed evidence in the record demonstrates that Winsome Investment Trust was acting as a Ponzi scheme and, therefore, the transfers made to Defendant [Ursula Andres] were made with the actual intent to defraud."[15]  Mr. Klein sought to enforce the judgment against Ursula Andres' only asset of value, her 50% interest in the Andres Home.  To do so, he domesticated the judgment in Texas where the Andres Home is located – an effort that both Ursula and Robert Andres opposed.[16]

Meanwhile, on August 24, 2011, Mr. Klein received notice from counsel for CitiMortgage that CitiMortgage was seeking to foreclose on the Andres Home based on the Andreses' failure to make mortgage payments.[17]  Mr. Klein negotiated a settlement with CitiMortgage that outlined a process for allocating proceeds from the sale of the home upon foreclosure, and obtained the receivership court's approval of the settlement.[18]  After numerous and lengthy delays caused in part by two bankruptcy petitions that Ursula Andres filed (both of which were dismissed within two months for "failure to file information"),[19] the Andreses' opposition to domestication of the

---

[13] Declaration of Wayne Klein, p. 2, par. 2 ("Winsome was a self-described private trust, headquartered in Houston, TX, run by Robert Andres who had complete and sole authority over the trust.").
[14] 2:11-CV-00656-SA, Dkt. 28; Declaration of Wayne Klein, p. 2, par. 3-4.
[15] 2:11-CV-00656-SA, Dkt. 28; Declaration of Wayne Klein, p. 2, par. 4.
[16] Declaration of Wayne Klein, p.2-3, par. 4-5.
[17] Declaration of Wayne Klein, p. 3, par. 6.
[18] Declaration of Wayne Klein, p. 3, par. 7-8.
[19] U.S. Bankruptcy Court, Southern District of Texas, Bankruptcy Petition # 4:13-BK-34925, filed on 8/6/13 and dismissed on 9/24/13 for failure to file information; U.S. Bankruptcy Court, Southern District of Texas, Bankruptcy Petition # 4:15-BK-32455, filed on 5/4/15 and dismissed on 6/29/15 for failure to file information.

Receiver's judgment in Texas, and unrealized offers by Robert Andres to bring the mortgage current, CitiMortgage foreclosed on the home in or about June 2016.[20] Pursuant to his settlement agreement with CitiMortgage, Mr. Klein received $16,734.89 of the foreclosure sale proceeds.[21]

Mr. Klein incurred considerable fees and costs in his hard-fought effort to recover the equity in the Andres Home. In his declaration, Mr. Klein divides these costs into the following four categories:

1. $7,627.89 in property management fees. These include fees for managing the property between the time Ursula Andres vacated the Andres Home and the time CitiMortgage completed the foreclosure and was ready to take possession of the property. They also include the cost of disposing of the personal property that Ursula Andres left in the home so that CitiMortgage could assume possession of the home.[22]

2. $7,419.98 in legal fees for domesticating the receivership's judgment against Ursula Andres in Texas, which Robert and Ursula Andres opposed. These fees were paid to the receivership's Texas counsel, Beck Redden, LLP.[23]

3. $9,611.00 in Mr. Klein's own fees. These fees pertain specifically to his effort to obtain and enforce the civil judgment against Ursula Andres and the Andres Home, and his effort to negotiate a settlement with CitiMortgage regarding the allocation of the foreclosure proceeds.[24]

---

[20] Declaration of Wayne Klein, p. 3, par. 9; Dkt. 122, p. 3 ($16,734.89 was recovered on June 6, 2016); Dkt. 123-1, p. 1 (the $16,734.89 was recovered from the foreclosure of the Andres Home).
[21] Declaration of Wayne Klein, p. 3, par. 10.
[22] Declaration of Wayne Klein, p. 4, par. 11(1), and Ex. A.
[23] Declaration of Wayne Klein, p. 4, par. 11(2), and Ex. B.
[24] Declaration of Wayne Klein, p. 4-5, par. 11(3), and Ex. C.

4. $13,487.32 in legal fees for pursuing and enforcing the civil judgment against Ursula Andres and the Andres Home. These fees were paid to the receivership's Utah counsel, Manning Curtis Bradshaw & Bednar, PLLC.[25]

To summarize, the receivership incurred fees and expenses totaling at least $38,146.19 in its effort to recover the equity from the Andres Home. The only amount the receivership recovered as a result of all these efforts is the $16,734.89 in sale proceeds it received from CitiMortgage when it finally foreclosed on the Andres Home.[26] Therefore, the fees and costs the Mr. Klein incurred as a direct result of his efforts to recover the equity in the Andres Home far exceed the amount he ultimately recovered. Consequently, none of the proceeds from the home were ever distributed to victims.

On September 29, 2016, the United States filed a Motion to Amend Judgment to Identify Victims Entitled to Restitution. In its Motion, the United States notified the Court that the receivership was closing soon, and that the Final Restitution Order therefore needed to be amended to order restitution payable directly to the victims. The United States recommended a *pro rata* allocation of restitution between the victims,[27] and requested that the Court credit to each of the victims their share of the $2,237,917.69[28] that the Receiver disbursed to them. The United States stated that the funds the Receiver disbursed to the victims were recovered from third parties and argued that these credits should therefore be divided between Defendant Holloway and Defendant

---

[25] Declaration of Wayne Klein, p. 5, par. 11(4), and Ex. D.
[26] Declaration of Wayne Klein, p. 5-6, par. 12.
[27] The total restitution ordered was $18,491,310.39 whereas the victims' total losses were $19,117,265.21. Therefore, the United States requested that the victims be allocated a share of restitution equal to 96.73% of their loss.
[28] Later increased to $2,237,920.11 to include the Receiver's own distribution to victim H.Z.

6

Andres according to their proportionate share of the total amount of restitution ordered.[29] The undersigned believed this statement to be true because the foreclosure funds were not included in the Receiver's distributions to the victims. The Court granted the United States' Motion to Amend on October 4, 2016.[30]

However, after the Court granted the United States' Motion, Defendant Andres filed a Response to the United States' Motion arguing that, contrary to the United States' Certificate of Service, the Motion was not mailed until October 12, 2016, and he did not receive it until October 17, 2016. He also stated objections to the United States' proposed distribution of restitution credit between him and Defendant Holloway but did not mention the foreclosure of his home or the $16,734.89 recovered therefrom.[31] In light of Mr. Andres' Response, the Court vacated its Order of October 4, 2016.[32] The United States replied and stated it had no objection to the Court hearing Mr. Andres' Response, and presented additional briefing to support its proposed distribution.[33] After considering the briefing of both parties, the Court again granted the United States' Motion to Amend.[34]

Subsequently, Defendant Andres filed a document entitled "Notice to the Court," in which he asserted a new argument that he should receive credit towards his restitution obligation for $16,734.89 received from the sale of his home.[35] The Court characterized this document as a

---

[29] Dkt. 115.
[30] Dkt. 116.
[31] Dkt. 118.
[32] Dkt. 119.
[33] Dkt. 120.
[34] Dkt. 121.
[35] Mr. Andres did not state specifically that these funds came from the foreclosure on his home, but by cross-referencing the recovery amount with its own records the United States was able to deduce that Mr. Andres was referring to the foreclosure.

"Motion for Timely Mailings and Proper Restitution Credit" on the docket (herein "Andres' Motion").[36] The United States opposed Defendant Andres' request for restitution credit arguing that the Receivership actually received a net negative amount from the foreclosure, and that the law of the case doctrine barred Andres from requesting a redistribution of credits already allocated in the Court's Order of November 21, 2016.[37] On January 17, 2017, the Court granted Andres' Motion and directed the United States "to credit Andres's restitution balance with the full $16,734.89, and to remove from Holloway's balance whatever portion of that amount was credited to him."[38]

The United States respectfully requests that the Court reconsider its ruling because the victims never received any of the foreclosure funds that the Receiver recovered from the Andres Home. The fees and costs the Receiver incurred as a direct result of his efforts to recover the equity in the Andres Home far exceed the $16,734.89 that he ultimately recovered resulting in a net negative to the receivership. Therefore, the United States cannot remove any credit from Mr. Holloway's balance as the Court has directed. Indeed, the addition of $16,734.89 to Andres' credit would result in a loss of the same amount to the victims. It would be manifest injustice for the victims to receive a shortfall while Mr. Andres receives a windfall, particularly where the shortfall was caused in large part by the Andreses' attempts to prevent the Receiver from recovering assets that Mr. Andres fraudulently obtained and fraudulently transferred to his wife. Consequently, this Court should reconsider granting Mr. Andres' motion.

---

[36] Dkt. 122.
[37] Dkt. 123.
[38] Dkt. 124.

8

On January 25, 2017, while drafting this Motion, Mr. Klein told the undersigned counsel that there was $896.19 in the receivership defendants' accounts when the receivership was created, and mentioned for the first time that these funds were included in his distributions to the victims. This information contradicted Mr. Klein's previous statement that "All the money we have recovered (and sent to victims) came from people we have sued."[39] In light of this new information, the undersigned acknowledges that her statement that, "the funds disbursed by the Receiver were recovered solely from third parties"[40] was incorrect. Unlike the $16,734.89 in foreclosure proceeds, the $896.19 in the receivership defendants' accounts was not absorbed by the Receiver's costs and expenses related to the recovery of those accounts, and therefore these funds are considered part of the Receiver's total distribution. The undersigned apologizes for this mistake. Under the Court's Order of November 21, 2016, the Defendants were each given a proportionate share of the credit for these funds. However, because some of these funds are traceable to the individual Defendants, the United States recommends that the funds held in Defendant Holloway's and Defendant Andres' personal accounts be credited to their respective restitution balances.

**ARGUMENT**

I. **GRANTING MR. ANDRES' MOTION WORKS AN INJUSTICE TO VICTIMS BECAUSE IT REQUIRES THEM TO BEAR THE BURDEN OF RECEIVER FEES THAT WERE INCURRED AS A RESULT OF MR. ANDRES' FRAUD.**

This Court should reconsider its prior ruling and deny Mr. Andres credit for the proceeds from his home that were never distributed to his crime victims. Whether in criminal or civil cases,

---

[39] Declaration of Wayne Klein, p. 6, par. 13-14; Dkt. 124-1.
[40] Dkt. 115, p. 8.

motions for reconsideration are proper to correct injustice. *United States v. Randall,* 666 F.3d 1238, 1241-42 (10th Cir. 2011) (recognizing that motions to reconsider filed in criminal cases to correct injustice is authorized by the Supreme Court); *Servants of Paraclete v. Does,* 204 F.3d 1005, 1012 (10th Cir. 2000) (recognizing that motions to reconsider are appropriate in civil cases to, among other things, correct injustice). As shown below, Mr. Andres should not be given any credit towards his restitution for the proceeds of the foreclosure of his home because none of that money reached any of his victims. The Court's decision would require Mr. Andres' victims to bear the burden of the Receiver's fees and costs, and thus would work a shortfall for them and a windfall for Mr. Andres.

Determining whether a receiver's distributions should be credited to the victims' and defendants' restitution balances should be a victim-centric inquiry; not a defendant-centric inquiry. This is because, in the Tenth Circuit, the sole purpose of restitution is to compensate victims. *See, e.g., United States v. Kieffer,* 596 F. App'x 653, 664 (10th Cir. 2014) (unpublished) ("Tenth Circuit precedent is clear that restitution is a civil remedy designed to compensate victims—not a criminal penalty."); *United States v. Serawop,* 505 F.3d 1112, 1123 (10th Cir. 2007) ("Despite plausible arguments from other circuits that '[c]riminal restitution rests with one foot in the world of criminal procedure and sentencing and the other in civil procedure and remedy,' in this circuit, restitution's two feet remain squarely planted in the field of compensation and remediation." (citation omitted)); *United States v. Nichols,* 169 F.3d 1255, 1279 (10th Cir. 1999) (holding that the purpose of the MVRA is "not to punish defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses"). Congress manifested this intention in 18 U.S.C. § 3664(j)(2), which provides that "[a]ny amount paid to a

victim under an order of restitution shall be reduced by any amount later <u>recovered</u> as compensatory damages for the same loss <u>by the victim</u> in any Federal civil proceeding and any State civil proceeding, to the extent provided by the law of the State." (Emphasis added). Interpreting section 3664(j)(2)'s plain language, as the law requires,[41] the meaning of the word "recover" means "[T]o get back; regain." Recover, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005). Similarly, the word "compensate" means, "To make up for or offset . . . To make payment or reparation to." Compensate, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005). Thus, Congress clearly indicated that the only way to measure restitution to victims is by the amount that the victims actually recover as compensation for their crime-induced losses. *See also* 18 U.S.C. § 3664(f)(1)(A) (requiring defendants to compensate their victims for the full amount of loss regardless of defendant's ability to pay). Consequently, the statutory authority that requires the court to credit external recoveries to a defendant's restitution obligation hinges on what the victims received, not on what the Defendants paid.

No authority exists to change this victim-centric approach when a receiver is involved. In a receivership, the receiver is entitled to retain the portion of the recovered assets necessary to cover the receiver's own fees and costs. 28 U.S.C. § 3103. The remainder of the receivership funds are then disbursed to the claimants or victims. Therefore, the victims necessarily receive less than the full amount of the assets that the receiver recovers. If defendants were given full restitution credit for all of the funds recovered by a receivership, regardless of whether those funds were disbursed to victims, then the credits would exceed the victims' actual recoveries, which is

---

[41] *FDIC v. Canfield*, 967 F.2d 443, 445 (10th Cir. 1992) ("As in any case of statutory interpretation, we begin with the plain language of the law." (citations and quotations omitted)).

contrary to statute and deprives victims of the restitution to which they are entitled. Instead, a defendant should bear the burden of any loss sustained from a receiver's participation because, but for the fraud, a receiver would not have been needed in the first place.

Given these principles, Mr. Andres is not entitled to credit for any of the proceeds from the foreclosure on his home. Although the Receiver collected $16,734.89 in proceeds from the foreclosure of Mr. Andres' home, the Receiver noted numerous expenses. These expenses were necessary to: (1) manage the property to keep its value for the sale; (2) take legal actions to obtain marketable title, which meant undoing the web of title that Mr. Andres and his wife had spun; and (3) receiving a fee for the work the Receiver did. Indeed, the Receiver's legal fees alone exceeded the $16,734.89 he recovered. Because Mr. Klein's efforts to recover the foreclosure sale proceeds resulted in a net negative recovery, none of the foreclosure funds ever reached the victims, and, therefore, giving Mr. Andres credit for money that his victims did not receive works a manifest injustice to those whom Mr. Andres previously defrauded.

**II.  THE UNDERSIGNED COUNSEL DID NOT INTENTIONALLY MISLEAD THE COURT IN ITS MOTION TO AMEND; HOWEVER, NEW INFORMATION INDICATES THAT $896.19, WHICH BELONGED TO THE INDIVIDUAL AND ENTITY RECEIVERSHIP DEFENDANTS, WAS DISBURSED TO VICTIMS.**

Naturally, this Court may wonder why this level of detail was not presented before this motion. To the extent this is the case, the undersigned unequivocally states that I never sought to mislead this Court in any way. Instead, my failure to provide this level of detailed information was based on my misunderstanding of the level of detail necessary to illustrate the argument above in addition to incomplete information that I received from the Receiver. I apologize for not

anticipating that the Court would want to consider the information regarding the foreclosure of Mr. Andres' home.

In the Motion to Amend, the undersigned made statements regarding the source of the funds that were *distributed to the victims*, not the source of the Receiver's *recoveries*.[42] This is more than a technical distinction. The Receiver stated in his email that "All the money we have recovered (and sent to victims) came from people we have sued. These include overpaid investors, business associates, law firms, credit card companies, etc."[43] The Receiver also said in his email that the foreclosure funds were completely absorbed by the Receiver's costs in recovering those funds resulting in a net negative. From this statement, the undersigned concluded that none of the foreclosure funds were disbursed to the victims. Therefore, the undersigned's statement that all funds "distributed to victims" were recovered from third parties is not only technically true, but, based on the information the Receiver provided, I believed it was actually true.

However, on January 25, 2017, while drafting this Motion, the undersigned learned that this was not actually true. Mr. Klein notified the undersigned that when he was first appointed as Receiver there was $896.19 in the Defendants' combined bank accounts.[44] The Receiver did tell the undersigned in his email of September 14, 2016, that "[w]hen the case was first started, there was less than $1,000 in the combined bank accounts of all companies and individual defendants,"

---

[42] "The receivership has distributed $2,237,917.69 in recovered funds to the victims as set forth in column F. Those funds must be credited to the restitution balances. According to Mr. Klein, the funds he distributed did not come from the Defendants, but rather came from third parties that the receivership sued, such as overpaid investors, business associates, law firms, credit card companies, etc." Dkt. 115, p. 5 (emphasis added). "However, in this case, the funds distributed by the Receiver were recovered solely from third parties." Dkt. 115, p. 8 (emphasis added).
[43] Dkt. 123-1, p. 1 (emphasis added).
[44] Declaration of Wayne Klein, p. 6, par. 13-14.

13

but he did not say that those funds were disbursed to victims. Rather, he said (as quoted above) that "all the money" he recovered and sent to victims "came from people we sued."[45] On January 25, 2017, the Receiver notified the undersigned that, in fact, these funds were disbursed to the victims.[46] Of the $896.19 held in the Defendants' combined bank accounts, $78.96 was recovered from Holloway personally; $78.96 was recovered from a businesses owned by Holloway; $142.30 was recovered from Andres personally; $544.92 was recovered from businesses owned by Andres; and $51.05 came from an unknown source.[47] Of the $896.19 that was held by the receivership's entity and individual defendants, the United States recommends crediting Holloway's personal $78.96 to his restitution balance, crediting Andres' personal $142.30 to his restitution balance, and allocating credit for the remaining $674.93 to Holloway and Andres according to their proportionate share of the total restitution obligation.[48] The United States recommends against crediting the businesses' funds to the Defendant who owned the business, because (1) from a legal perspective, funds of a business are not funds owned by the business owner, and (2) those funds may be derived from investments made by the victims of both Mr. Holloway and Mr. Andres.

The undersigned understands the Court's frustration that the information regarding the foreclosure of Andres' home was not presented to the Court in its Motion to Amend and in hindsight agrees that it should have been included and apologizes for the fact that it was not. The undersigned also should have pressed the Receiver for more information regarding the "$1000 in

---

[45] Dkt. 123-1, p. 1.
[46] Declaration of Wayne Klein, p. 6, par. 14.
[47] Declaration of Wayne Klein, p. 6-7, par. 15-16.
[48] The proportionate share the Court awarded in its Order of November 21, 2016, is 82.2% to Robert Holloway and 17.8% to Robert Andres. Dkt. 115, p. 5-6, par. 10; Dkt. 121, p. 2, par. 2.

14

the combined bank accounts"[49] of the defendants to determine whether these funds were disbursed to the victims. The undersigned omitted the foreclosure information from the Motion to Amend because, for all the reasons stated in this Motion, I simply did not think it was relevant. It seemed clear to me that if none of the foreclosure funds reached the victims, then they should not be included in the credits to the victims' or the Defendants' restitution balances. The undersigned was focused on solving the problem of how to allocate restitution between victims whose total losses exceeded the amount of the restitution order, crediting the victims' restitution balances for the funds they recovered from the receivership, and determining the fairest way to divide those credits between the two Defendants. Any failure on the part of the undersigned or the Receiver should not harm the innocent victims that Mr. Andres defrauded.

## **CONCLUSION**

For the reasons stated above, this Court should reconsider giving Mr. Andres credit for the $16,734.89 recovered by the Receiver from the foreclosure of his home. The United States further requests that the court credit $78.96 to Holloway's restitution balance and $142.30 to Andres' restitution balance. The remaining $2,237,698.85 of the Receiver's total distributions to the

///

---

[49] Dkt. 123-1, p. 1.

victims[50] should be credited to Holloway and Andres based on their proportionate share of the total restitution debt – 82.2% to Holloway and 17.8% to Andres.[51]

DATED this 3rd day of February, 2017.

>JOHN W. HUBER
>United States Attorney
>
>*/s/ Allison J.P. Moon*
>ALLISON J.P. MOON
>Assistant United States Attorney

---

[50] $2,237,920.11 - $78.96 - $142.30 = $2,237,698.85.

[51] In its order of January 17, 2017, the Court directed the United States to "remove from Holloway's balance whatever portion of [the $16,734.89 in foreclosure funds] was credited to him." First, the Clerk of the Court is the official record keeper for restitution debts, and therefore, the Court's directive would more appropriately be addressed to the Clerk. Second, Holloway did not receive any credit for the $16,734.89 under the Court's previous order because those funds never reached the victims. Therefore, if the Court denies this Motion for Reconsideration and affirms its Order of January 17, 2017, then the United States requests that the Court specify the amount the Clerk is to remove from Holloway's credit and add to Andres' credit. Using these numbers, the Clerk and the United States can recalculate how much each Defendant owes to each victim.

CERTIFICATE OF SERVICE

I hereby certify that I am an Assistant U.S. Attorney for the United States Attorney's Office for the District of Utah and that copies of the United States' MOTION FOR RECONSIDERATION OF DEFENDANT ANDRES' MOTION FOR APPLICATION OF FORECLOSURE PROCEEDS TO RESTITUTION BALANCE, the DECLARATION OF RECEIVER WAYNE KLEIN IN SUPPORT OF MOTION FOR RECONSIDERATION and exhibits thereto, and the Court's ORDER of January 17, 2017 were served upon the parties by placing a copy of same in the United States mail, postage prepaid, this 3rd day of February, 2017, addressed as follows:

> Robert Andres, Inmate No. 71972-279
> FCI Englewood
> 9595 West Quincy Avenue
> Littleton, CO 80123
> Defendant
>
> Robert L. Holloway, Inmate No. 29851-298
> FCI Fort Worth
> PO Box 15330
> Fort Worth, TX 76119
> Defendant

> /s/ Allison J.P. Moon
> Allison J.P. Moon